ORIGINAL

FILED
MAR 19 2008
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GILL-SIMPSON, INC.

v. No. 08-190 C

THE UNITED STATES OF AMERICA

## COMPLAINT

Plaintiff, Gill-Simpson, Inc. ("GSI"), by its attorneys, Eli Robbins, and Harrison Law Group, sues Defendant, The United States of America ("USA"), and for its causes of action, says:

### The Parties

1. Plaintiff, GSI, is an electrical contracting company organized and existing under the laws of the State of Maryland with its principal place of business in Baltimore, Maryland.

2. The Defendant is the United States of America by and through the National Security Agency (the "NSA" or the "Government").

### Jurisdiction and Venue

3. This Court has jurisdiction and venue pursuant to 28 U.S.C. § 1491(b).

### Regulation That Mandates Payment Of Money

4. Pursuant to F.A.R. §§ 52.243-4, 52.243-5, the NSA is required to pay GSI for the additional work provided by GSI to the NSA on the project commonly referred to as the "OPS2A & 2B Buildings Replacement of Fire Alarm System", Contract No.: MDA904-03-C-0259 (the "Project"), as will be more fully set forth below.

### Background

5. On or about September 28, 2003, GSI entered into a construction contract (the "Prime Contract") with the NSA for the construction of the Project which consisted of the demolition of the existing fire alarm system and the replacement and installation of a new fire alarm

system including, but not limited to, providing labor, equipment, materials and supervision for such work, and the testing of the new fire alarm system at the OPS2A and OPS2B buildings at NSA's Fort Meade, Maryland facilities. A copy of the relevant portions of the Prime Contract is attached hereto and incorporated by reference herein as **Exhibit "A"**. GSI's scope of work is further detailed in the Project Specifications at Sections 01100, 13851, 16050-16470, copies of which are attached hereto and collectively incorporated by reference herein as **Exhibit "B"**.

6. The initial value of the Prime Contract, before changes, additions and deletions, totaled Two Million Two Hundred Thirty Thousand Dollars and No Cents ($2,230,000.00). *See* Exhibit "A".

7. In addition, the Prime Contract includes the Changes clause contained at FAR § 52.243-4 and the Changes and Changed Conditions clause contained at FAR § 52.243-5, as supplemented by Defense Acquisition Regulations System ("DARS") § 252.243-7001 (Pricing of Contract Modifications) and §252.243-7002 (Requests for Equitable Adjustment). *See* Exhibit "A".

8. In submitting its bid for this Project, GSI based its bid estimate on the timely and efficient execution and coordination of the Project. GSI also fully expected that the Contract completion period of 357 calendar days would be fully accommodated. GSI fully expected that it could proceed to perform in the manner set forth in the specifications and as originally agreed. GSI also fully expected timely responses to requests for information ("RFIs"), shop drawing submittals, design questions and clarifications, and coordination and approval of any necessary additions, deletions and other Contract modifications, not only to enable GSI to complete its work within the Contract period, but to also allow GSI the opportunity to achieve the competitive labor units GSI carried in its Project estimate. GSI also fully expected to have reasonable access to the Project site and related Government personnel to enable it to perform its scope of work.

9. GSI submitted a Preliminary Schedule prior to Contract award, which was specifically agreed to by the Government. According to the Preliminary Schedule, GSI was to start on the Project on November 3, 2003 and be completed by October 18, 2004 – a period of 357 calendar days. A copy of the Preliminary Schedule is attached hereto as **Exhibit "C"**.

10. GSI planned to work as set forth in the Preliminary Schedule. Working in this manner would have allowed crews to be formed, which crews would have performed the same tasks from area to area and would have established a productive and increasingly efficient job rhythm. In scheduling its work and labor forces, GSI intended to build up its work force in an orderly progression to arrive at an optimum peak which could be maintained at a uniform pace. The Preliminary Schedule reflected a normal sequential installation.

11. Unfortunately, the actual conditions throughout the Project exceeded what GSI could have reasonably anticipated in terms of delays, disruptions and impacts, as compared to when GSI prepared its original bid estimate and Preliminary Schedule. The progress of installation of the fire alarm system on the Project was delayed, disrupted and impacted from the beginning of the Project, and these delays, impacts and disruptions continued throughout the duration of GSI's work on the Project. Although, pursuant to the Preliminary Schedule, GSI had planned to complete the Project by October 18, 2004, the Project was still not substantially complete as of August 31, 2007.

**Lack of General Access To Critical Project Areas**

12. It was imperative to GSI's efficient performance to have reasonably unrestricted access to the Project site. Because of the nature of the Project, access to the site was recognized as a critical element of performance.

13. The Government had agreed to provide an ample amount of escorts during normal working hours. From the beginning of the Project, however, the Government failed to provide

adequate escorts, and GSI was concomitantly impacted and disrupted as its personnel was prevented from performing its work in certain areas.

14. GSI notified the Government of these problems on numerous occasions. Recognizing its inability to provide sufficient escorts for GSI on the Project, the Government requested that GSI perform its scope of work on the second shift, during the hours of 4:00 PM – 1:00 AM.

15. As a result of the Government's direction that GSI perform its work on the second shift, GSI was required not only to seek skilled crews that were available on the second shift, but also to pay its work force a premium wage, an additional cost that was not anticipated or agreed to at bid time.

16. Accordingly, the Government agreed to compensate GSI for the premium wage it was required to pay, and in fact, compensated GSI for premium costs relating to the direction to perform its work on the second shift through March, 2005. However, the Government has refused to pay GSI for the premium costs incurred relating to working on the second shift from April, 2005 through August 31, 2007. These costs total Forty-Four Thousand Nine Hundred Forty-Four Dollars and Eight Cents ($44,944.08).

17. However, the direction to work on the second shift had an additional impact on GSI's work because key Government Project personnel were unavailable or inaccessible during the second shift. During normal working hours, GSI's questions or concerns were resolved in a reasonable time because key personnel were available and on site during those hours. However, when working on the second shift, the key personnel were either not immediately available or completely unavailable, which resulted in additional lost time due to delayed responses to RFIs and design or performance questions.

18. Although working the second shift was supposed to address the site access issues GSI was experiencing from the commencement of the Project, the switch to second shift work did not address those issues.

19. Notwithstanding that GSI properly scheduled its work in certain areas, on many occasions GSI was denied access without notice because many offices or other areas were either locked or otherwise inaccessible during the second shift time period. Gaining entry to certain work areas was problematic throughout the Project, resulting in lost time.

20. In addition, on several occasions, GSI was asked to evacuate an area. Because of these and other problems, GSI had to demobilize its crew in the area, redirect its forces elsewhere and remobilize in other areas in order to keep its crews occupied. The constant demobilization and remobilization of GSI's forces, and the concomitant resequencing of the work GSI was required to perform due to the lack of access, evacuations, and related issues, resulted in numerous lost hours to GSI and severely impacted and disrupted GSI's efficient performance of its work on the Project.

21. GSI notified the Government on numerous occasions that it was continuing to experience site access issues despite working on the second shift, to no avail.

<u>**Delayed Access to Fire Alarm Control Room**</u>

22. The Fire Alarm System Control Room was a critical element in GSI's performance and central to its system. Typically, GSI works from the head-end of a fire alarm system, which is the main panel, out to the branches of the system. Working in this manner is necessary as it allows GSI to check and pre-test the fire-alarm devices at the time of installation, as opposed to back-tracking later to install and pre-test the devices, and is the most efficient way to install the fire alarm system. In this instance however, GSI did not have access to build the main control panel in the fire alarm control room as per the schedule, and was therefore forced to start working the branches back

to the main panel area and return later, after the main control panel was installed, to install and pre-test the devices.

23. Because the Government failed to provide GSI with access to the main fire alarm control room as was scheduled, GSI was required to install the system in a backwards manner, re-sequence events and reschedule work crews in areas that were accessible, to work in a piecemeal fashion, and to otherwise leave loose ends throughout the building because of the lack of a central control system. This resequencing of events directly impacted and disrupted GSI's performance, resulting in lost hours and inefficient performance of work crews.

**Delayed Release of Software for New System**

24. The Government was supposed to provide GSI with the software for the new fire alarm system no later than January, 2004. However, the new software was not ready at that time, and GSI did not receive the new software from the Government until the end of April, 2004.

25. The Government's delay in releasing the new software system further delayed and impacted GSI in that it could not test new fire alarm system could not be tested until the software upon which it was based was installed.

**Significant Change to Work Sequence by Government**

26. GSI's bid was based on the sequence of construction as set forth in the Specifications. The Specifications called for the following work sequence and method of construction:

> 01100 – 1.4(A). The Work shall be conducted in two phases.
> 1. Phase one: This phase shall consist of installation of replacement systems. Work of this phase shall be substantially complete and ready for acceptance testing within 180 business days of the Notice to Proceed.
>
> 2. Phase two: This phase shall consist of the demolition of the existing system. The removal of the existing system shall commence after successful testing and approval of the replacement system.

13851 – 1.2(G).

2.d. EXISTING TO NEW SYSTEMS INTERFACE: (When both old and new systems must act as "one" system). Equipment furnished under this contract shall be made capable of interfacing with the existing system equipment. This shall not require two-way data exchange, but shall require alarm, trouble and supervisory monitoring and any alarm input/output function connections required to act as a single system during the project life cycle.

*See* Exhibit "B".

27. Thus, pursuant to the specifications, GSI was to first complete the installation of the new system, which includes tying the new system into the existing system, and once that was complete, demolishing the old system.

28. Accordingly, GSI originally planned to fully install the replacement system in one building, tie the replacement system into the existing system, fully test and inspect the new system, complete the changeover from the existing system, proceed to demolish the old system, and then perform the same tasks in the next building. GSI's plan ("Job Flow Plan") was based on a floor-by-floor installation of the new system, essentially requiring a uni-directional flow through the Project site, allowing maximum and efficient use of resources during the performance of its work. A copy of the GSI's Job Flow Plan is attached hereto and incorporated by reference herein as **Exhibit "D"**. GSI's Preliminary Schedule, consistent with its bid estimate, was based on the Job Flow Plan.

29. Apparently the Government was unclear as to why GSI's floor-by-floor Job Flow Plan was more efficient and better suited to the nature of the Project than a whole building installation plan advocated by the Government. In or about late February, 2004, the Government asked GSI to prepare a list of reasons supporting its floor-by-floor Job Flow Plan as opposed to a whole building installation.

30. Pursuant to the Government's request, GSI prepared a list of reasons why the installation in accordance with the Job Flow Plan was more efficient than the installation proposed by the Government. GSI noted, among other things, that a change to a whole building installation

plan would require several passes through each building, as opposed to the uni-directional work flow GSI had planned through each building. Pursuant to the whole-building installation plan, GSI would be required to mane one pass was to install the "backbone", another pass to install the pull stations, a third pass to install the tampers and flows, a fourth pass to install the new system, a fifth pass to preliminarily test the new system on a floor-by-floor basis, a sixth pass to remove the old system, a seventh pass to install the software, and an eighth and final pass to test the entire building's system. Such a change would significantly impact and disrupt GSI's performance efficiency and duration.

31. Nevertheless, in or around July of 2004, the Government unilaterally revised the Work Sequence as set forth in the Specifications and required GSI to perform its work on a whole building installation plan as opposed to the more efficient uni-directional floor-by-floor plan GSI originally expected and which was planned in the Project Specifications. A copy of the Government's Revised Work Sequence is attached hereto and incorporated by reference herein as **Exhibit "E"**.

32. The Revised Work Sequence significantly impacted, delayed and disrupted GSI's performance and deviated substantially from GSI's Preliminary Schedule and Job Flow Plan. More importantly, the Revised Work Sequence differed significantly from the sequence set forth in the Specifications, which provided the basis on which GSI prepared its bid for the Project. Not only did GSI absorb numerous inefficient labor hours due to the additional passes through each building that were required to adhere to the Revised Work Sequence, GSI expended numerous additional hours as a direct result of the change. These hours were not contemplated in GSI's original budget and bid estimate.

**Other Delays and Damages**

33. GSI's continuity of work was further compromised throughout the duration of the Project because of other, continuing, delays. GSI was delayed in its performance due to scheduling conflicts, failures by the Government, and failures on the part of other contractors engaged by the Government.

34. These and other issues further impacted and disrupted GSI's performance. In fact, GSI has yet to complete the Project and has been prevented from completing the Project because the necessary outages required for testing of the system have not been scheduled.

35. As a result of all of the delays and issues set forth above, GSI was severely impacted, delayed and disrupted, through no fault of its own. Because of these delays, disruptions and impacts, GSI expended more man hours over a longer period of time than it had originally planned. According to the Preliminary Schedule, GSI should have substantially completed its work by October 18, 2004. However, as a result of the delays, disruptions and impacts set forth above, GSI has not yet reached substantial completion.

36. GSI repeatedly gave notice in writing of the delays, impacts and disruptions on this Project. GSI also gave notice of the potential delays and impacts that the Revised Work Sequence would cause. Nevertheless, the Government continued to delay and disrupt GSI's work on the Project, and GSI incurred, and is continuing to incur, substantial damages as a result.

37. GSI planned to expend 28,990 hours on this Project. Yet, because of the delays, impacts, and disruptions to the Project and GSI's work on the Project, as of August 31, 2007, GSI expended 43,343 base contract total hours on the Project through August 31, 2007,[1] which results in a project labor overrun of 14,353 hours through August 31, 2007. The labor overrun multiplied by

---

[1] GSI actually expended a total of 46,870 hours on the Project. However, 1,104 hours were deducted as they relate to hours spent performing change order work and for which GSI has been compensated, and 2,423 hours were deducted as they relate to lost time for which GSI has also been compensated.

GSI's composite hourly rate of $37.60 per hour results in a cost overrun of $539,672.80 through August 31, 2007.[2]

38. GSI also incurred delay damages consisting of extended general conditions, and additional Project management, field supervision, tooling, and financing costs as a result of the delays to the Project. Through August 31, 2007, the total additional costs incurred by GSI as a result of the delays to the Project is $221,466.85.

**Damages Summary**

39. Thus, as a result of the delays, impacts, and disruptions GSI experienced on the Project, none of which were the fault of GSI and all of which were the fault of the Government, GSI incurred damages totaling $926,996.29, through August 31, 2007, as follows:

| | | |
|---|---|---|
| Additional Shift Premium Cost | $ | 44,944.08 |
| Extended General Conditions | $ | 221,466.85 |
| Labor Inefficiencies | $ | 539,672.80 |
| Sub Total | $ | 806,083.73 |
| Plus OH&P (15%) | $ | 120,912.56 |
| Total Damages Through 8/31/07 | $ | 926,996.29 |

40. GSI submitted its Claim and Request for Equitable Adjustment to the Government on October 9, 2007.[3] More than 60 days have passed since GSI submitted its Claim and Request for Equitable Adjustment to the Government, yet the Government has failed to respond to GSI's Claim and Request for Equitable Adjustment. Pursuant to 41 U.S.C.A. § 605(b)(5), the Government's failure to issue a decision on GSI's Claim and Request for Equitable Adjustment constitutes a

[2] GSI also performed an MCAA labor inefficiency analysis which demonstrated that GSI's labor on the Project was 50% inefficient due to the issues set forth above. Because GSI planned to expend 28,990 hours on the Project, pursuant to the MCAA analysis, GSI could have expected a labor overrun of 14,495 hours. As is stands, as of August 31, 2007, GSI's actual labor overrun of 14,353 hours is remarkably close to the MCAA analysis results.

[3] Due to the size and volume of documents which are attached to the Claim and Request for Equitable Adjustment, a copy is not being attached as an exhibit hereto. However, a copy of a FedEx receipt showing that Mr. Borkoski signed for the Claim and Request for Equitable Adjustment on October 9, 2007 is attached hereto and incorporated by reference herein as **Exhibit "F"**.

deemed denial of GSI's Claim and Request for Equitable Adjustment and entitles GSI to seek resolution of its Claim in this Court.

**COUNT I**
**(Breach of Contract)**

41. GSI adopts and incorporates by reference herein its averments contained in Paragraphs One (1) through Forty (40) as set forth above.

42. As a result of the Governments actions and inactions, as set forth more particularly above, the Government became liable to pay GSI the amount of $926,996.29 through August 31, 2007 as compensation for the additional labor GSI rendered to the Project pursuant to FAR § 52.243-4.

43. The Government's failure to remit full payment of this amount to GSI as compensation for the additional labor rendered by GSI to the Project pursuant to FAR § 52.243-4 constitutes a breach of its contractual obligations, and the sum of $926,996.29 remains due and owing from the Government to GSI, through August 31, 2007.

WHEREFORE, Plaintiff, Gill-Simpson, Inc. demands judgment against Defendant, The United States of America in an amount not less than $926,996.29, the exact amount to be proven at trial, pre-judgment interest at the highest legal rate pursuant to 41 U.S.C. § 611 and 48 C.F.R. § 33.208, reasonable costs and attorneys' fees in accordance with the Equal Access to Justice Act, 28 U.S.C. §2412, post judgment interest at the highest legal rate, and such other and further relief as the Court deems just.

**COUNT II**
**(Equitable Adjustment)**

44. GSI adopts and incorporates by reference herein its averments contained in Paragraphs One (1) through Forty (40) as set forth above.

45. The Government's actions and inactions on the Project, as set forth more

particularly above, caused GSI to incur additional costs not contemplated in the Prime Contract.

46. GSI timely notified the Government that its actions and inactions constituted changes to the scope of work as set forth in the Prime Contract.

47. Pursuant to the changes clause set forth at FAR § 52.243-4, the changes and changed conditions clause set forth at FAR § 52.243-5, and the requests for equitable adjustment clause set forth at Defense Acquisition Regulations System § 252.243-7002, the Government is required to make an equitable adjustment to the Prime Contract to compensate GSI for the additional costs it incurred as a result of the Government's actions and inactions on the Project.

48. To date, the Government has refused to equitably adjust the Prime Contract to compensate GSI for the additional costs incurred by GSI as a result of the Government's actions and inactions on the Project, despite request therefor.

WHEREFORE, Plaintiff, Gill-Simpson, Inc. demands judgment against Defendant, The United States of America in an amount not less than $926,996.29, the exact amount to be proven at trial, pre-judgment interest at the highest legal rate pursuant to 41 U.S.C. § 611 and 48 C.F.R. § 33.208, reasonable costs and attorneys' fees in accordance with the Equal Access to Justice Act, 28 U.S.C. §2412, post judgment interest at the highest legal rate, and such other and further relief as the Court deems just.

Dated 3/17/08

ELI ROBBINS

HARRISON LAW GROUP
40 W. Chesapeake Ave., Suite 600
Towson, Maryland 21204
Telephone No.: (410) 832-0000
Facsimile No.: (410) 832-9929

Counsel for Plaintiff,
GILL-SIMPSON, INC.